# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------------------------------------------------X
ROBERT MORAN                              )
                          Plaintiff,      )
                                          )
v.                                        )   CIVIL ACTION NO.
                                          )
TOWN OF GREENWICH, COMMISSIONER           )
FRED CAMILLO, FORMER COMMISSIONER PETER   )
TESEI, CHIEF JAMES HEAVEY,  SGT. SEAN     )
O'DONNELL, P.O. ANDREW GRECO,             )
P.O. BRIAN TORNGA, HAYES PODMOKLY, in their )
Official and Individual Capacities        )
                                          )
                                          )
                          Defendants.     )   March 10, 2023
-----------------------------------------------------------------------X
```

## COMPLAINT AND JURY DEMAND

Plaintiff, Robert Moran, by his attorney GARY N. RAWLINS, as and for his Complaint against the Defendants respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to U.S.C. § 1083 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitution of the State of Connecticut and the United States.

## JURISDICTION

2.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. 1988 and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

3.      Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.  The plaintiff invokes this Court's supplemental jurisdiction, pursuant to 28 USC § 1376(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this court that they form part of the same case or controversy.

## VENUE

4.      Venue is properly laid in the District of Connecticut under U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6.      Plaintiff, Robert Moran, is a citizen of the United States, and at all relevant times a resident of Brooklyn, New York, and State of New York.

7.      Defendant, TOWN OF GREENWICH, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of Connecticut.

8.      Defendant, TOWN OF GREENWICH, maintains the Greenwich Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per applicable sections of the Connecticut General Statutes, acting under the direction and supervision of the aforementioned municipal corporation, The City of Greenwich.

9.     That at all times hereinafter mentioned, the individually named Defendants, were duly sworn officers of said department and were acting under the supervision of said department and according to their official duties.

10.     That all times hereinafter mentioned the Defendants, either personally or through their employees, were acting under the color of state law and/or compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State of Connecticut or Town of Greenwich.

11.     Each and all of the acts of the individual Defendants alleged herein were done by said Defendants while acting within the scope of their employment by the Defendant Town of Greenwich.

12.     Each and all of the acts of the individual Defendants alleged herein were done by said Defendants while acting in furtherance of their employment by the Defendant TOWN OF GREENWICH.

13.     At all times mentioned in this Complaint, the individual Defendants acted jointly and in concert with each other. Each individual Defendant had the duty and opportunity to protect the Plaintiff from the unlawful actions of the other individual Defendants but each individual Defendant failed and refused to perform such duty, thereby proximately causing the Plaintiff's injuries.

**FACTS**

14.     On May 14, 2017, Plaintiff Robert Moran was arrested in Greenwich, Connecticut.  In complaint 19cv0072(VAB), Plaintiff Robert Moran alleges that several officers used excessive force in that arrest and that he suffered serious injuries as a result of the use of excessive force.   Although malicious prosecution and related claims were alleged in that action, those claims had not ripened as the criminal case was still pending at the time that the civil complaint was filed.

15.     Plaintiff incorporates the facts alleged in 19cv0072(VAB) in this complaint and attaches the digitally analyzed concatenated videotape of the tape originally produced in 19cv0072(VAB) by way of this link Concatenated 5 videos level adjust .mp4-Sharpen-Combine-Modify Clarified A V .mp4 as Exhibit 1  Plaintiff also attaches an enhanced view of the portion of the tape in which he alleges he was choked:

IMG_0383.MOV-Combine-Modify Audio C 2 -Levels-Sharpen-Times-Times-Times Subclip.mp4. Exhibit 2  Both links clarify and sharpen the audio and visual.   These links show the choking section of the videotape in slow motion:

IMG_0383.MOV-Combine-Modify Audio C 2 -Levels-Sharpen-Times-Times-Times-Modify slow mo -Modify-Levels.mp4.  Exhibit 3  IMG_0383.MOV-Combine-Modify Audio C 2 -Levels-Sharpen-Times-Times-Times-Modify slow mo -Modify.mp4 Exhibit 4.   Additionally, plaintiff attaches the enhanced audio of the tapes as Exhibits 5 Concatenated Audio Clarified .mp4 .  The report of Jennifer Owen, of Owen Forensics Services, LLC who performed the analysis is attached as Exhibit A.

16.     Additional facts include:     On May 14, 2017, the on scene Defendants in 19cv0072(VAB), encountered Robert Moran, a Hispanic Male and his then partner, a White Female and her three biracial black/white children not of the Plaintiff, who is hispanic.

17.     Mr. Moran's partner was questioned regarding whether the children were Mr. Moran's.    Defendants received a negative reply.

18.     Once on the scene, Officer Greco regarded Mr. Moran as a person who, "had an inability to focus, his thoughts continued to shift along with the tone of his voice."  Greco had determined that Moran was "acting irrationally, seemingly bipolar in his behavior and not reasonable in the way he was acting."  He wrote that Mr. Moran was, "erratic, angry, loud, made rude and insulting comments" and appeared unwilling to cooperate with the arrest.

19.     The false statements in Police Officer Greco's report and statements included, but are not limited to the following: 1.  Moran began to move south within the rear of the parking lot. 2. "Moran attempted to roll his body when I heard a popping sound from his left arm." 3. "Moran then spat on Sergeant O'Donnell and threatened to inflict  harm on him." 5. "He then attempted to roll his body when I heard a popping sound from his left arm." 6.  That he did not want to harm Moran, but was simply trying to control him.  7. That he was trying to get the arms closer together for handcuffing. 8. That they [he] was trying to control Moran with minimal amount of harm.

20.     On the videotape, Mr. Moran did not attempt to roll his body or spit at anyone at any time.  On the videotape, as Mr. Moran is being choked at 10:40-10:42, P.O. Tornga states, "His spit, don't touch it." The videotape does not show that P.O. Greco attempted to treat Mr. Moran's wounds.

21.    The false statements made by P.O. Scaglio include: 1. "After he was seated [on the stretcher] he attempted to stand up against the orders of officers.  Sgt. O'Donnell placed his hand on Moran's right shoulder/chest area and forced him back into a seated position on the stretcher." 2. "Moran then spat towards Sgt O'Donnell." 3. "That Moran spit on O'Donnell and O'Donnell tried to push him back down on the stretcher."

22.    The false statements by then P.O. (now Sergeant) Brian Tornga include:  1. He did not know when Moran sustained his arm injury.  2.  After sitting up Moran spat at O'Donnell.

23.    The false and incomplete statements made/endorsed and approved by Chief Heavey include Captain Robert Berry's conclusions that: 1. "While attempting to move the left arm closer to the right one in order to link hand cuffs [sic] and finally restrain Moran, Moran's left arm sustained a fracture." 2.  "Officers were then able to complete cuffing." 3.  "Lieutenant Zuccerella's officer interviews also seemed to indicate that the collective goal of the officers involved in the incident was to take Moran into custody."  4. That the use of force conformed with UPMs 5001(Use of Force) and 5039 (Reporting and Investigating Use of Force).   5. That the use of force used by the officers was reasonable and that the injuries sustained was an "unintended result."  6.   That the officers' use of force was "objectively reasonable."  7. All officers on scene completed use of force reports.  8. That all officers completed their own Use of Force Reports.   9.  That the officers did not know when the arm break occurred.  9.  That Moran tried to spit at any time. 10.  Moran is pushed back down onto the stretcher. 11.  Moran was spitting at Officers. 12.  CAD and all reports lacking any reference to I.P. Man. 12.  The opinion and conclusion that   P.O. Greco's use of force "was consistent with his training and the Department's use of force policy." 13. That P.O. Greco's arm control technique, "seems reasonable and not intended to purposely inflict pain or injury on Moran."14.  That O'Donnell's

use of force "was consistent with his training and the Department's use of force policy."  15. That O'Donnell was, "simply trying to control Moran and prevent him from inflicting harm on anyone else."

24.     Upon information and belief, former Commissioner Peter Tesei and Chief Heavy chose to ignore the following data during the investigation and throughout the criminal prosecution of Moran:  1.  The digital data on the videoclips provided.  2.  Reviewing enhancement of the videoclips to determine exactly who did what, when they did it and why they did it (see Exhibit 1). 3.  The Memorandum of P.O. Jeff Morris, the civilian complaint  Robert Moran filed to which he never received a response as required.

25.     Materials Commissioner Camillo, Chief Heavy and the Town of Greenwich chose to ignore after defendant officers and defendant expert James Borden testified in the civil case include the following:  1.  The testimony of P.O. Greco that Mr. Moran did not roll his body.  2. The testimony of Sergeant Brian Tornga that he may have had some difficulty reaching the handcuff to handcuff Mr. Moran.  3.  Upon information and belief,  Deputy Chief Zuccerella's completion of the section of the UOF forms entitled Name of Personnel Directly Involved and Control Method Utilized. 4.  Upon information and belief, the data from the enhanced videoclips in the possession of the defendants and/or that James Borden communicated to the defendants who testified that he used software to analyze the video clips from the Iphone and had the ability to highlight audio and video as demonstrated in Exhibit 1.

26.     Upon information and belief, for reasons only known to the defendants who brutalized Mr. Moran, P.O. Greco and Seargent O'Donnell were triggered and became hyper-aggressive toward Mr. Moran.  The defendants knew or should have known that these officers were commonly known to have violent trigger responses to, among other things,  being

body shamed,  having their rank disrespected, and being ignored when giving commands. Consequently, certain words and scenarios experienced by these officers more likely than not would result in the unnecessary use of force and emotional upset/damage to the officer.

27.     Sergeant O'Donnell and P.O. Greco engaged in a takedown of Mr. Moran who the evidence indicates may have been on the ground already.  P.O. Greco secured Mr. Moran's left arm.  The left arm was eventually handcuffed and pinned to the small of Mr. Moran's back as he lay prone on the ground.  Officer Tornga handcuffed Mr. Moran's right wrist.  As he reached down and grabbed the handcuff to connect the two ends to complete the handcuffing, Officer Greco torqued Mr. Moran's left arm toward his head, resulting in a loud cracking sound.  This was done while Officer Scaglio was holding the handcuffed left wrist on the small of Mr. Moran's back.

28.     There was nothing obstructing Officer Tornga from obtaining and connecting the handcuff that was on Mr. Moran's left wrist.  No one ever testified that the cuff was blocked and there is nothing in any of the documentation of the incident indicating that the cuff was blocked or covered.  The videotape does not show any indication that the left wrist was blocked.

29.     Immediately after the arm break, an Officer can be heard saying, "that hurt." Officer Tornga completed the handcuffing and spontaneously and gleefully uttered, "I.P. MAN" at 1:01 on the Exhibit 1  He then grabbed his radio and exclaimed over the air, "I.P. MAN" at 1:10.  At 1:13 the transmission can be heard over the air.  After inspecting Mr. Moran's arm, Officer Tornga stood, looked directly at P.O. Greco and said, "I.P. Man"  at 1:31.  Concurrently, P.O. Greco addressed the group and looked at Sergeant Petruso and said, " We got him on the ground already, I.P. Man came through and broke it."  Exhibit 1 at 1:28-1:36  Moran, overheard what he said and commented that he was already on the ground when the officers made contact

with his body (specifically he said, "I was on the ground already when you wanted to F@$k with me, so what's up?").

30.     A google search of the term reveals that I.P. MAN is a former Chinese police officer and martial artist who trained Bruce Lee (https://en.wikipedia.org/wiki/Ip_Man).   This youtube link of the 2010 film (one of many)  at 1:50 appears to show the maneuver that was used to break Mr. Moran's arm: ▶ Ip Man (2010) - Ip Man vs. 10 Black Belts Scene (6/10) | Movie…

31.     The scene depicts the rage that IP Man expressed and vengeance exacted after he was triggered because  his good friend was killed competing.  Upon information and belief, Officer Tornga made a comparison between Officer Greco's rage/anger/annoyance and IP Man's rage/anger/annoyance/vengeance and how both men resorted to a specific technique of breaking arms to dispel their rage through vengeance.  It should be noted that in Exhibit 1, after the arm break, like I.P. Man in the movieclip, P.O. Greco appeared satisfied and genuinely did not fear that he had done anything improper.   His verbal expression and body language did not indicate concern for Mr. Moran in the moments immediately after the arm break.

32.     Upon  information  and  belief,  Officer  Brian  Tornga,  witnessed  the hyper-aggression/rage  of P.O.  Greco just  prior to  making his  I.P. Man  statement which was picked up in his radio transmission to headquarters.    The radio transmission of officer Tornga is attached hereto as Exhibit 5: 07_Patrol_1_2017_05_14_13_19_14_by_Start_Time_asc.wav. In it P.O. Tornga, "56" reports that Mr. Moran is in custody at 0:05.  Then at 0:13-0:14 P.O. Tornga is on air to headquarters to deadpan, "I.P. Man."  Headquarters then responds at 0:17, "You repea…." Tornga responds, "56."   Dispatcher responds  "10-4 subject in custody."   The transmission appears to cut out between the statements and it is unclear what was transmitted if anything between the statements.  The audio has been provided as a true copy of the original.

33.     At 2:34-2:37 on Exhibit 1, P.O, Scaglio/Podmokley states, "he didn't run, he didn't run."

34.     Mr. Moran exercised his First Amendment rights by making numerous statements regarding what occurred, how outrageous the officers' actions were, whether the officers were done, questioning why the officers would break his arm, explaining that doing so was not necessary as the arm was already locked up, expressing that "this is a lot of pain (2X), and a number of offensive and disrespectful statements including, but not limited to: "Fat F*ck", (3:23), and "He wants to act all big" (3:53-3:56), "P*s*y, and B*@ch."

35.     All the officers witnessed  Sergeant O'Donnell and P.O. Brian Tornga push Mr. Moran onto the floor after he was handcuffed. The officers on top of Mr. Moran did not heed Sergeant Petrusso's suggestion that they leave Mr. Moran alone until the paramedics arrived.

36.     Upon information and belief, Officer Tornga verbalized that he saw spittle on Mr. Moran's face and warned the officers not to touch it.    This was immediately after Sergeant O'Donnell placed both his hands around Mr. Moran's neck and pressed forcefully down for a moment. See Exhibit 1.  10:31- 10:42.  P.O. Brian Tornga then covered Mr. Moran's face with a towel/cloth.   Upon information and belief, this was done to prevent Moran's excited utterance that "he choked me" from being heard.

37.     None of the officers ever saw Mr. Moran spit at anyone just prior to the towel being placed on his face.

38.     On the scene none of the officers reported being hurt when questioned by the supervising Lieutenant who is not identified on the tape.   Exhibit 6:

https://drive.google.com/file/d/1dzAqQN5T_sNMf0ICIYVYMGTtOpYRSzi5/view?usp=share_link.

39.    Upon information and belief there was no basis for the GPD's claim that Mr. Moran assaulted a peace officer (53a-167c).

40.    During the investigation into what occurred, the supervising officer instructed the Sergeant's on scene to contact him privately on his cell.  Upon information and belief, it was at this moment that the cover up and plot to ratchet up the charges against Mr. Moran began.   Upon information and belief, all over the air statements about I.P. Man ceased and involved Officers were encouraged to seek medical assistance.  Upon information and belief, Officer Scaglio made complaints about shoulder and knee injuries.   Sergeant O'Donnell made complaints about injury to his right thumb.

41.    Upon information and belief, in violation of the Eighth Amendment of the United States Constitution,   a higher bail of $100,000 dollars was imposed as a consequence of the claims that Mr. Moran assaulted peace officers.   Those same officers were later requested to oppose alternatives for the resolution of Mr. Moran's criminal case, including an accelerated rehabilitation program, citing their "injuries" and financial losses as a reason why Mr. Moran should be denied the program.

42.    Upon information and belief, P.O.Scaglio had a preexisting injury to her shoulders that she claimed Mr. Moran caused.   In short, the evidence will reveal that she had swimmer's shoulders starting from May 11, 2010 when she swam as a youngster through the four years of competitive swimming she did while in college.

43.    Upon information and belief, Sergeant O'Donnell's damaged tendon on his right thumb either did not in fact exist, was preexisting or was as a result of his placing his hands at or around Mr. Moran's throat and pressing down forcefully as seen in the video clip.

44.     Plaintiff sought early on in the litigation under docket number 19cv0072(VAB) to obtain the consent of the defendants to amend his complaint to allege 1.  Malicious Prosecution (Defendants A. Initiated a criminal prosecution against Mr. Moran for assaulting peace officers, B. The prosecution ended in Plaintiff's favor, C. There was no probable cause to initiate the criminal prosecution for assault on a peace officer, D.  The defendants acted maliciously in providing false information/incomplete information/fabricated information to impose a higher bail and prison time penalty.  2.  Abuse of Process (the defendants employed criminal legal process for the unlawful purpose of insulating the Town and the defendants from liability for the actions committed by the officers on the videotape and continue to maintain a frivolous legal defense for the same purpose).  3. Retaliatory Prosecution (Moran was assaulted for exercising his First Amendment right to speak his mind as can be heard on the videotape and to express his opinions about what was occurring and what he felt about the people with whom he engaged. This, and other triggers,  angered and annoyed the defendant officers resulting in their using excessive force against him, breaking his arm and choking him to exact revenge and to punish him).  4. Fabrication of Evidence (falsifying information in the case incident reports and investigation documentation related to the broken arm, the force applied to Mr. Moran's neck and spitting).  5.  Brady violations (including withholding: The Morris Report that indicated that "unauthorized and untaught verbal commands and tactics  [were] deployed, resulting  in significant injury to Mr. Moran's arm." The reviewing training officer's opinion that, "P/O Greco's actions and use of force during the arrest of Robert Moran, that at best, it was a grossly ignorant improvisation of arrest and control techniques, or at worst, a conscious use of excessive force." 6. Breach of duty to investigate (failing to analyze the video clips as best evidence, failing to properly consider and  process Robert Moran's civilian complaints; failing to have

adequate procedures in place to analyze the performance of the officers involved and make the appropriate referrals).  7. Failure to train and to discipline regarding the post excessive force actions related to reporting, honesty and the oath to tell the truth (which continues to date). 8. Defamation (claiming that Moran assaulted officers causing physical damage where at least one (or both) of the complaining officers had known pre-existing injuries and alleged those injuries were caused by Mr. Moran).  9.  Conspiracy to violate Mr. Moran's civil rights under 1983 and 1985(3) by leveling false assault claims against him.  10.  The separate claims of intentional and negligent infliction of emotional distress/emotional damage for the malicious prosecution, continued denial of the excessive force from the date of the event to date.  10.  The abuse of process claim related to the defense of 19cv0072(VAB), and Violation of the Unfair Trade Practices Act, as the defendants provided Mr. Moran's mugshot to Hearst media and other media outlets in an attempt to shape the narrative and reduce their liability.   The false information provided to the media was that Mr. Moran assaulted three officers, attempted to flee and caused the officers to break his arm.  The defendants in 19cv0072(VAB) refused to provide consent for the amendment, necessitating the need to file this complaint before the statute of limitations period expires.

45.     After Mr. Moran was arrested and it was learned his arm was broken, the officers on scene were instructed by the supervisor to go to the hospital where Sergeant O'Donnell claimed injury to the right hand and Scaglio claimed injury to her shoulders and knee. The defendants acted in concert to to cover up multiple uses of excessive force, commit Brady violations and to increase the penalties Mr. Moran would be prosecuted for all to limit financial liability to the Town and to protect the individual officers from being held accountable.

46.     Rather than having their consciously and thoughtfully selected video expert James Borden analyze the video data as the best evidence to determine who did and said what and when they did it, Chief Heavy, Deputy Chief Robert Berry, Deputy Chief Marino and Lt. Mark Zucarella conducted investigations and reviews that they knew or should have known were intentionally incomplete and replete with material material misrepresentations.    Those misrepresentations included assertions that William Larkin did not witness any use of force and that the force used was limited to removing Robert Moran's arms from under him.

47.     The investigation gave zero consideration to what was on the videotape the GPD POST certified use of force training instructor Jeff Morris' conclusions that: "The most critical point whenever force is applied to assist Officers in completing an arrest is when Officers gain and maintain control of a resisting subject, coupled with the recognition that no further force application is necessary."   "As Moran's right arm was removed from underneath his torso and placed behind his back, while six Officers maintained control of his entire body, there was no obvious indication for a higher level of force to be applied." "It is at this moment during the handcuffing procedure when unauthorized and untaught verbal commands and tactics are deployed, resulting in a significant injury to Moran's left arm." "Following the unknown technique applied to Moran's left arm by PO Greco, resulting in a fracture of the same, was further documentation in a G.P.D. Incident report of an applied unknown technique that is clearly outside of current CT POST approved defensive tactics technique standards." "It is my opinion in viewing P/O Greco's actions and use of force during the arrest of Robert Moran, that at best, it was a grossly ignorant improvisation of arrest and control techniques or at worst, a conscious use of excessive force." "I would respectfully request a full review of this incident by The

Greenwich Police Department and I would strongly suggest substantial retraining for all G.P.D.

Personnel involved in this incident."

48.     Chief Heavey did not ask Officer Morris to review that section of videotape where

Mr. Moran was choked.

49.     Deputy Chief Zuccerella's misrepresentations, endorsed by Chief Heavey include

but are not limited to: 1.  "The point the arm breaks is not known, seen nor heard."  2.  Reporting

that there were four (4) videoclips when in fact there are five (5).  3.  Concluding that the use of

force complied with the UPM 5004(a)(1).    4.  Representing that "Moran attempted to roll his

body while his left arm was behind his back." (Greco testified that this is false); 5.  Completing

sections of Petruso's UOF report and representing it as her writing (upon information and belief

he completed certain sections of the other defendant officers' report.)  Specifically, the numbers

provided related to the force used was not her writing and the name of the personnel involved

was not her writing.  Upon information and belief Lt. Zuccerella wrote the names of the officers

involved and inserted the numbers for the force use.    6.  In his Case/Incident report Officer

Greco wrote, "He then attempted to roll his body when I heard a popping sound from his left

arm." "I then felt his arm lose tension."  Lt. Zuccerella repeated this factually false statement in

his UOF report.

50.  Lt. Zuccarella read and endorsed Greco's false statement  that he  "I asked

Moran for his right arm again, and Officer Tornga was able to remove the arm and apply the

handcuffs."

51.  In his case incident report, Sergeant O'Donnell reported, "I pushed Moran back

down onto  the stretcher and told him to stop resisting and to comply."  He also wrote, "Moran

immediately  spit  at  me  but  missed."    These  were  some  of  the  false  statements  made  to

maliciously prosecute Mr. Moran who was not able to spit as he was being choked.   The video clearly captured the numerous times Mr. Moran told Sgt. O'Donnell to get off him and that he would comply with the paramedics.  The Town knew of and failed to  address and monitor his persistent failure to engage in effective de-escalation and failed to address the underlying cause(s) of his action(s).

52.     Hayes Scaglio reported in her case incident report that Officer Greco was yelling at Mr. Moran.  Hayes also reported that she witnessed Mr. Moran spit toward officer Greco. The video does not show the act.

53.     On April 27, 2018, Captain Berry, who was not trained as and never was a defensive tactics instructor, was ordered by command staff to complete  Administrative Review of Force Investigation 2017-006 of the use of force related to the Moran arrest.   The report completely omitted the findings by the defensive tactics instructor that there was either a grossly negligent application of an arrest technique or an intentional use of force.   The memorandum indicating this was not mentioned at all in the report.

54.     Deputy Chief Berry failed to consider that the force used as shown in the video could be interpreted as being used to torture,  inflict punishment, and/or to exact revenge.   The force included pushing Moran to the ground, choking him, placing him on a stretcher on his damaged ulnar nerve which caused further stretching and compression of the nerve, and placing a towel over his head to prevent him complaining about being choked.

55.     Despite quoting UPM 5039 related to reporting and investigating  force and the the department's commitment to documenting and investigating all use of force incidents and the section's requirement that officers who use force, or witness it, are required to report it and document it, Chief Berry failed to comply with this requirement and failed to detect that Lt.

Zuccarella, Sergeant O'Donnell, Chief Heavey, Sergeant Larkin, Hayes Scaglio, Brian Tornga, and Sergeant Petruso failed to fully and completely document the force applied to Mr. Moran after he was placed in handcuffs including moving him from an upright position to a restrained position on the ground (causing additional damage to his exposed ulnar nerve), choking him on the stretcher (further causing damage to the exposed ulnar nerve) and placing a towel over his head to prevent his informing those around he was being choked.  Despite noting that the Shift Commander, in this case Lt. Zucarrella was required to ensure that all officers complete the use of force forms themselves, Deputy Chief Berry did not confirm that the officers did in fact do so. In fact, upon information and belief, Lt. Zuccerella completed entries related to the type of force used in all of the use of force forms submitted.

56.    As a result of the unlawful and wholly unjustified actions of the individual Defendants, the Plaintiff sustained the following injuries:

   a.  EMOTIONAL DAMAGES
   b.  VIOLATION OF HIS CIVIL RIGHTS;
   c.  ATTORNEYS FEES AND COSTS;
   d.  SLANDER AND LIABLE
   e.  DEFAMATION;
   f.  SEVERE EMOTIONAL DISTRESS/DAMAGE EXACERBATED BY PTSD;
   g.  EXACERBATION OF PSYCHOLOGICAL AND EMOTIONAL MENTAL INJURIES

57.    The Plaintiff's injuries, or some of them, will be permanent in nature and/or permanently disabling.

58.    From all the injuries or effects thereof, the Plaintiff was rendered  disabled and is suffering and will continue to suffer from emotional damages/upset as outlined above, limitation of motion and restriction of activity.

59.    As a further result of the Defendants' unlawful and wrongful conduct, it is reasonably probable that the Plaintiff's future earning capacity will be impaired.

60.     In order to cover up their unlawful and wrongful conduct, the individual Defendants prepared false, fraudulent and misleading incident reports, and  made false, fraudulent, and misleading statements to their superior officers and to the prosecuting attorney for Geographical Area No. 1 of the Superior Court. As a result of said false reports and statements, the Plaintiff was wrongfully charged with assault on a peace officer among other charges.

61.     Upon information and belief, Chief Heavey knew P.O. Greco, as a young officer, was prone to using excessive force in situations that did not warrant it.  For example, he personally witnessed P.O. Greco taser a 16 year old black male at or around 1:30  on Christmas Day in 2014 because the child refused to follow his order to "sit down immediately" on a sofa in the mother's home.    At the time the child readied to exit his mother's house to go to his father's house.  The child was not suspected of having committed a crime, was not informed that he was under arrest or a danger to anyone in the residence or himself.

62.  He simply wanted to leave without providing his father's telephone number or communicating with Chief Heavey,  P.O. Greco and one P.O. Franco.  It should be noted that the GPD was summoned because someone in the family was concerned about the whereabouts of a family member, not because of anything the child did.  After obtaining the phone number from another family member, the father indicated he would pick his son up.  Why Chief Heavey, P.O. Greco and P.O. Franco saw the need to handcuff the child who was leaving to meet his father is known only to them.   Rather than allow the child to leave, P.O. Franco removed the child's "heavy varsity jacket" so that P.O. Greco could taser him multiple times. *Just so his father could pick him up on Christmas Morning.*   Immediately after the interaction the child complained of shoulder pain.   The child was charged with Disorderly Conduct 53a-182, Criminal Mischief

53a-116, and interfering with an Officer 53a-167 for trying to leave his mother's residence on Christmas morning so that he could meet his father.   It should be noted that no one called the police for the child or to address anything the child did.


63.  It should also be noted that the case incident reports the officers involved wrote contained conflicting information regarding who called the police and what the purpose of them being at the home was and whether they should have been in the home at all.   Then Sgt. Mark Zuccerella was acting as supervisor at the time and signed off on the statements of the officers. Chief Heavey who was there, participated in the handcuffing, and witnessed the event,  did not provide a statement.

64. Further proof of a pattern of excessive force use is the tasing of an eighteen year old student who threw water balloons and sprayed water guns as part of the Greenwich High School senior prank day in 2008.   It should be noted that while a large part of the senior class participated in the prank, only one Hispanic kid from a single parent home was tasered.

65. Upon information and belief, the information supplied in the case incident reports did not correspond to what was captured on the videotape.   The young man was charged and despite the conflicting evidence, was successfully prosecuted.  The community protested the young man's arrest and subsequent prosecution.   See Blog coverage of the incident and suggesting disparities based on a variety of factors in bail , arrests, enforcement and prosecution can be seen here: http://greenwichroundup.blogspot.com/2008/05/052108-why-didnt-david-curin-get-5.

66.  In line with state-wide statistics, police use excessive force on poor black and hispanic people more often than on rich and middle class white people for the same or similar conduct.   Please see: Shock and Law: Police & Taser Use in Connecticut.   In Greenwich, the

two children who were tasered were Hispanic and Black.   In both cases, upon information and belief, the use of force was excessive and completely unwarranted.   Also in both cases, the officers were never held accountable.   All media coverage was supportive of the officers actions. In the case of the Hispanic young man who was tasered, the school security video was never turned over for an independent review to determine whether the use of force was appropriate.

66.  Upon information and belief Chief James Heavey mailed then Town Attorney Wayne Fox, Esq., and the State's Attorney a package containing the videoclips and  the Morris Memorandum indicating that Greco's actions were, " a grossly ignorant improvisation of arrest and control techniques or at worst, a conscious use of excessive force."  At the time, the State's Attorney was prosecuting Robert Moran.

67.  Upon information and belief, Chief Heavy was aware that the force used against Robert Moran was excessive and communicated with The Town and Commissioner Peter Tesei regarding the incident.    Upon information and belief, Commissioner Tesei knew or should have known that Officer Greco used excessive force.   Upon information and belief, former Commissioner Peter Tesei, Chief Heavy, former Town Attorney Wayne Fox and anyone who viewed the recordings knew or should have known that P.O. Greco used excessive force on Robert Moran.  Please see Exhibit 1.   Chief Heavey initiated an Internal Affairs investigation numbered IA 2017-004 into the matter on  **July 5, 2017**.  Mr. Moran served the Greenwich Police Department with a civilian complaint on or about **April, 19, 2018**.  On or about **May 21, 2018**, after receiving Robert Moran's civilian complaint, the IA2017-004 was converted to an Administrative Review of Force.    The Administrative Review is alleged to have been //completed on or about **April 27, 2018** and found, "there were no policy violations identified in this use of force incident."    Documentation reveals that the IA was converted to an

Administrative review because "information developed that prompted Chief Heavey to discontinue the investigation as an Internal Affairs matter."   There is no record of what that additional information was other than that Robert Moran made a complaint and the knowledge that he was likely to file a lawsuit.   At the same time, Robert Moran was being prosecuted for assaulting officers by the State's Attorney in the Stanford Superior Court where he believed he faced life in prison.   On **February 21, 2018**, Defendant Scaglio and Sergeant O'Donnell appeared in Stamford Superior Criminal Court at a hearing for an accelerated rehabilitation program and testified against approval of a program for Robert Moran.  On **May 15, 2019** Robert Moran filed a civil rights lawsuit in the United States District Court in Connecticut for excessive force and violation of his civil rights.   On **May 29, 2019**, Robert Moran was granted the right to participate in an accelerated rehabilitation program.

68.  Approximately two years later, Robert Moran's criminal case concluded on **June 26, 2020** and was sealed.

69.  As a result of Commissioner Tesei's and Chief Heavey's decision to terminate the IA investigation for unknown reasons (Plaintiff maintains that it was terminated to protect the Town from liability),  their failure to find that excessive force was used on three separate occasions against Robert Moran and their decision not to hold the officers responsible, Robert Moran sustained damages as outlined in his Federal Complaints.

70.  As a further result of the foregoing, Plaintiff sustained bodily injuries as previously set forth, loss of liberty, emotional distress, embarrassment and humiliation, and deprivation of his constitutional rights.

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

71.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs numbered "1" through "70" with the same force and effect as if fully set forth herein.

72.    All the aforementioned acts of Defendants, their agents, servants and employees were carried out under the color of state law.

73.    All of the aforementioned acts deprived Plaintiff Robert Moran of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

74.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers, with all the actual and/or apparent authority attendant thereto.

75.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers, Greenwich Police Department pursuant to the customs, usages, practices, procedures, and the rules of the Town of Greenwich and the Police Department, under all the supervision of ranking officers of said department.

76.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

77.    The acts deprived Plaintiff of his constitutional rights: not to be subject to malicious prosecution, abuse of process, and Brady violations/Suppression of Material Favorable Evidence:  (including but not limited to The Morris Report, true and accurate reports related to the manner in which Moran's arm being broken, reports related to Officer Greco being referred

to as IP Man, true and accurate reports related to the injuries alleged by P.O. Scaglio/Podmokly and Sergeant O'Donnell).

78.     Defendants violated Mr. Moran's constitutional right to due process under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), when they failed to disclose "material favorable evidence" that would likely have led to an outcome more favorable to Mr. Moran in the criminal proceedings against him.

## SECOND CLAIM FOR RELIEF
## ABUSE OF PROCESS  IN THE CRIMINAL CASE UNDER 42 U.S.C. § 1983

79.     Plaintiff  repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "78" with the same force and effect as if fully set forth herein.

80.     Defendants lacked probable cause to initiate criminal proceedings against Plaintiff Robert Moran for assault on the involved officers.

81.     Defendants issued legal process to place Plaintiff Robert Moran under arrest for assaulting police officers.

82.     Defendants arrested and charged Plaintiff in order to obtain a collateral objective outside the legitimate ends of the legal process.

83.     Defendants acted with intent to do harm to Plaintiff Robert Moran without excuse or justification and were motivated to protect themselves, the Town of Greenwich and their colleagues from being held accountable;  and to profit from the occurrence.

84.     As a result of the foregoing, Plaintiff sustained loss of liberty, emotional damages and distress, embarrassment and humiliation, and deprivation of his constitutional rights.

## THIRD CLAIM FOR RELIEF
## ABUSE OF PROCESS IN THE CIVIL CASE UNDER 42 U.S.C. § 1983

85.    Plaintiff  repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "84" with the same force and effect as if fully set forth herein.

86.    The defendants, in their official capacities used legal process, such as filing a lawsuit or making a false statement under oath, to achieve a particular purpose.

87. Improper purpose: The defendant used the legal process for an the improper Purpose of preventing or delaying accountability for the defendants and to limit or prevent just compensation to Mr. Moran for his injuries and to otherwise harm the plaintiff.

88. Lack of probable cause: The defendants lack probable cause or a valid reason for using the legal process in that they knew or should have known that the legal process was being used for an improper purpose.

89. Ulterior motive: The defendants must have and had an ulterior motive or hidden agenda for using the legal process. This means that the defendant must have had some reason beyond the legitimate use of the legal process.

90. Special injury: The plaintiff must suffered special psychological injuries and harm as a result of the abuse of process, including emotional distress, lost time and money, or damage to reputation.

91.    Defendants lacked probable cause to both initiate criminal proceedings against Plaintiff Robert Moran for assault on the involved officers and lack any legitimate defense related to the civil rights claims of excessive force, malicious prosecution related to officer assault and all other claims related to the beating and conspiracy to maliciously prosecute and abuse process.

92.    Defendants issued a legal process to place Plaintiff Robert Moran under arrest for assaulting police officers, a felony, and several misdemeanors with little or slight penalties.

93.     Defendants arrested and charged Plaintiff in order to obtain a collateral objective outside the legitimate ends of the legal process.

94.     Defendants acted with intent to do harm to Plaintiff Robert Moran without excuse or justification and were motivated to protect themselves, the Town of Greenwich and their colleagues from being held accountable, and to profit from the occurrence.

95.     As a result of the foregoing in the pending civil proceeding resulting from the criminal proceeding, Plaintiff sustained severe emotional and psychological damages, loss of liberty, emotional distress, embarrassment and humiliation, and deprivation of his constitutional rights.

**THIRD CLAIM FOR RELIEF**
**MUNICIPAL LIABILITY**

96.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "95" as if the same were more fully set forth at length herein.

97.     The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers, with all the actual and/or apparent authority attendant thereto.

98.     The acts complained of were carried out by the aforementioned individual Defendants in their capacities as Commisioner of the police, Police Chief and as Police  Officers pursuant to the customs, policies, usage, practices, procedures, and rules of the Defendants  and the Town of Greenwich The Greenwich Police Department, all under the supervision of ranking officers of said department.

99.    The customs, policies, usages, practices, procedures and rules of the Defendant Town of Greenwich and the Greenwich Police Department constituted a deliberate indifference to the safety, well-being and constitutional rights of the Plaintiff Robert Moran.

100.    The customs, policies, usages, practices, procedures and rules of the Defendant Town of Greenwich and the Greenwich Police Department were the direct and proximate cause of the constitutional violations suffered by the Plaintiff Robert Moran as alleged herein.

101.    The customs, policies, usages, practices, procedures and rules of the Defendant Town of Greenwich and the Greenwich Police Department were the moving force behind the constitutional violations suffered by the Plaintiff Robert Moran as alleged herein.

102.    As a result of the customs, policies, usages, practices, procedures and rules of the Defendant Town of Greenwich and Greenwich Police Department, Plaintiff Robert Moran was subjected to unlawful and excessive force resulting in permanent and disabling injuries.

103.    As a result of the customs, policies, usages, practices, procedures and rules of the Defendant Town of Greenwich and Greenwich Police Department, Plaintiff Robert Moran was subjected to unlawful and malicious prosecution, abuse of process, Brady violations, slander and defamation, and unfair trade practices resulting in permanent and disabling injuries.  The defendants, collectively and individually, while acting under color of state law, and in their individual capacities were directly and actively involved in violating the constitutional rights of Plaintiff Robert Moran.

104.    Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of Plaintiff Robert Moran's constitutional rights.

105.     Defendant Commissioner and Chief, collectively and individually, in their individual capacities and in their official capacities,  while acting under color of state law, caused, permitted, allowed, and perpetuated a police department that had a *de facto* policy of never holding an officer accountable for employing excessive force.  While perpetuating this policy, the defendants acquiesced in a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of Plaintiff Robert Moran's constitutional rights. All of the foregoing acts by Defendants deprived Plaintiff Robert Moran of federally protected rights including, but not limited to, the right:

a.       Not to have excessive force imposed upon him;

b.       Not to have summary punishment imposed upon him;

c.       To receive equal protection under the law; and

d.       Not to be subject to unreasonable searches and seizures.

106.     Not to have images of his person in a mentally ill state traded for direct or indirect profit for advertising and digital media purposes

107.     As a result of the foregoing, Plaintiff sustained, loss of liberty, emotional damage, exacerbation of psychological injuries, emotional distress, loss of income, embarrassment, humiliation, and deprivation of his constitutional rights.

**FOURTH CLAIM FOR RELIEF**
**CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS**

108.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraph "1" through "107" as if the same were more fully set forth at length herein.

109.     Defendants conspired and acted in concert to do whatever was necessary, to cause the arrest, prosecution, detention of Plaintiff Robert Moran for assault.

110.    Throughout the period of conspiracy, the Defendants pursued their objectives with actual malice toward Plaintiff, with utter indifference to and disregard for Plaintiff's rights under the Constitution and laws of the United States, without probable cause or reasonable cause to believe Plaintiff guilty of assault.

111.    Pursuant to the conspiracy, the Defendant conspirators, and their employees, agents and servants, intentionally, recklessly, negligently, and/or with complete indifference to the rights of the Plaintiff Robert Moran: (a) manufactured false evidence; (b) pressured and induced and attempted to induce witnesses to give untruthful, erroneous, incomplete and/or misleading statements; (c) failed to correct such false statements; and (d) withheld evidence favorable to the accused on the issue of guilt or innocence.

112.    Those misrepresentations and false statements included claims that Robert Moran attacked officers, harmed officers, that Robert Moran tried to escape, that Officer Tornga "reached for the set of handcuffs attached to Mr. Moran's left wrist but was unable to grab it", (no one ever testified to this and it emerged as a possibility after lawyers were retained as attorneys for all the defendants and counseled all the defendants to tell the same story.)

113.    The aforesaid conduct of the Defendants operated to deprive Plaintiff Robert Moran of important and well established rights under the Constitution and laws of the United States including, but not limited to, his rights:

(a)    Not to be deprived of his liberty or to be arrested, detained or imprisoned except upon probable cause to believe him guilty of a crime, under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution;

(b)    Not to be deprived of his liberty or to be arrested, indicated, or prosecuted based upon evidence fabricated by a government official(s); and

(c)     Not to be deprived of his liberty or be arrested, prosecuted or imprisoned based upon the testimony of witnesses who had been illegally influenced, directly or indirectly, for their testimony.

114.    The foregoing violations of Plaintiff Robert Moran's constitutional rights by Defendants directly and proximately caused Plaintiff's prolonged arrest, detention, and deprivation of liberty and two year emotionally damaging prosecution and six year civil litigation saga.

**FIFTH CLAIM FOR RELIEF**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

115.    Plaintiff repeats, reiterates and realleges each and every allegation contained in Paragraphs numbered "1" through "114" with the same force and effect as if fully set forth herein.

116.    The individual Defendants' aforesaid conduct created an unreasonable risk of causing the Plaintiff emotional distress.

117.    The Plaintiff's distress was foreseeable.

118.    The emotional distress was severe enough that it might result in exacerbation of mental illness and/or bodily harm.

119.    The individual Defendants' conduct was the cause of the Plaintiff's distress.

120.    By virtue of the foregoing conduct, the individual Defendants inflicted upon the Plaintiff severe emotional distress.

121.    As a result of the foregoing conduct, the Plaintiff suffers and will continue to suffer from trauma, anxiety, fear, and trepidation.

122.    As a result of the individual Defendants' conduct, the Plaintiff claims damages.

123.    In the matter described above, the Defendant negligently inflicted emotional distress upon the Plaintiff in the performance of their police duties.

## SIXTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

116.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "115" with the same force and effect as if fully set forth herein.

117.    The individual Defendants intended to inflict emotional distress upon the Plaintiff and/or they knew or should have known that emotional distress was the likely result of their conduct.

118.    The individual Defendants' conduct was extreme and outrageous.

119.    The individual Defendants' conduct was the cause of the Plaintiff's distress.

120.    The emotional distress sustained by the Plaintiff was severe.

121.    By virtue of the foregoing conduct, the Plaintiff suffers and will continue to suffer from trauma, anxiety, fear, and trepidation.

122.    As a result of the individual Defendants' conduct, the Plaintiff claims damages.

123.    By virtue of the foregoing, the Defendants deprived the Plaintiff of his right to be free of the intentional infliction of severe emotional distress by means of outrageous conduct.

## SEVENTH CLAIM FOR RELIEF
## NEGLIGENCE

124.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "123" with the same force and effect as if fully set forth herein.

125.    The injuries, damages, and losses sustained by the Plaintiff Robert Moran were caused by the negligence and carelessness of the Defendant Former Commissioner Peter Tesei,

Police Commissioner Fred Camillo, Chief James Heavey, the Town of Greenwich, in one or more of the following ways:

       a.    IN THAT it failed to properly train the individual Defendants with regard to the proper investigation, methods of accountability, initiation of criminal process, initiation of civil defenses that are properly thoroughly examined for veracity and completely informed by truth and not based on possibilities designed to obfuscate truth as captured on the videoclip attached as Exhibit 1;

       b.    IN THAT it failed to properly train the individual Defendants with regard to the proper use of videoclips for investigation;

       c.    IN THAT it failed to properly train the individual Defendants with regard to implicit bias and biases as it relates to the the proper use of force;

       d.    IN THAT it failed to properly train the individual Defendants in creating a Police Culture of fidelity to the Constitution of the United States and the truths set forth therein;

       e.    IN THAT it failed to properly train the individual Defendants in recognizing and guarding against peer pressure to participate in turning a blind eye to Constitutional violations derived from providing incomplete and inaccurate reports and failing to process the best evidence available for analysis;

       F.    IN THAT the defendants failed to implement a system to efficiently and immediately update and correct factual misstatements as it relates to suspects and to ensure that individual Constitutional rights are upheld;

       G.  IN THAT THE defendants failed to implement a system to hold the Town, the Chief and the Commissioner accountable and prevent any act that would infringe on the Constitutional rights of any suspect potentially exposing the Town to liability;

H.    IN THAT  defendants failed to implement a system to allow officers to submit memorandum anonymously to address officer misconduct;

f.    IN THAT it failed to assist the individual Defendants in the safe performance of their duties in conformity with the Constitution;

g.    IN THAT it failed to properly screen the individual Defendant(s) for behavioral problems prior to hiring them.

h.    IN THAT it created a paramilitary culture in which fidelity to the Constitution and truth were secondary to adherence to organizational structure, defacto policies regarding zero tolerance for findings of excessive force; and reinforcing that unwritten policy by affirmative action,

i.    IN THAT it failed to properly supervise the individual Defendants with regard to the incident in question;

j.    IN  THAT it failed to properly supervise and train the individual Defendants and such failure was a deliberate indifference to the probable consequences or constituted an implicit authorization of such consequences; including failure to address implicit bias'

k.    IN THAT it participates in customs that lead to violations of individual constitutional rights;

l.    IN THAT it acted with deliberate indifference to the constitutional rights of others;

m.    IN THAT it failed to enforce the law as it existed;

n.    IN THAT it failed to prevent its police officers from committing illegal actions when it knew or should have known such actions were taking place; and

o.      IN THAT it had notice of but repeatedly failed to make any meaningful investigation into charges that its police officers were repeatedly violating its citizen's constitutional rights.

P.      IN THAT it failed to educate and train officers to realize that they are human beings subject to human emotions and that they must, as part of their physical training, learn the power that the physical training provides, making it essential that they manage their emotions of anger, outrage, and rage and otherwise control their emotions.

**WHEREFORE,** the Plaintiff claims judgment against the Defendants and each of them jointly and severally  as follows:

A.  Compensatory damages in an amount this Court shall consider to be just reasonable and fair on each individual cause of action against each defendant;

B.  Punitive damages in an amount this Court shall consider to be just, reasonable and fair on each cause of action against each defendant;

C.  Attorney fees and the costs of this action;

D.  Such other relief as this Court shall consider to be fair and equitable.

THE PLAINTIFF,
Robert Moran

*Gary N. Rawlins*

BY_____/s/_____
           Gary N. Rawlins, Esq.
           Fed Bar No. CT29313
           Attorney for Plaintiff
           Rawlins Law, PLLC
           777 Westchester Avenue, Suite 101
           (212) 926-0050
           E-Mail: rawlinsfirm@gmail.com

## CERTIFICATION

I hereby certify that on March 10, 2023, a copy of the foregoing complaint was filed electronically and served by mail on anyone unable to accept the electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by First Class Mail to any one unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

*Gary N. Rawlins*

CT29313
Gary N. Rawlins